# COURT OF ERRORS AND APPEALS,

## JUNE TERM,

## 1886.

WILLIAM H. SWIFT, plaintiff in error *v.* STATE, *ex. rel.* DAVID M. RICHARDSON.

*Mandamus—Jurisdiction of Court—When Granted—Foreign Corporation.*

The writ of mandamus and the right to it in all cases to which it is applicable is clearly recognized in the jurisprudence of this State; but issues only where there is a clear and specific legal right to be enforced, or a duty which ought to be and can be performed, and where there is no other specific and adequate legal remedy; the writ is never granted in doubtful cases.

A stockholder in a private corporation is entitled to an inspection and copies of its books, papers and other documents at proper times and on proper occasions, the stockholder showing clearly a right on his part to such inspection and copies; and on refusal thereof by the *custos* of such documents, may have a mandamus to compel said *custos* to allow the same; and the corporation need not be made a party to the proceedings.

When a foreign corporation holds property and does business within this State it subjects itself to the law of this State in the same manner and to the same extent, in respect to such property and business, as it would be bound to were it a corporation created by this State, and owes obedience to the mandates of the courts of this State in these respects as if it were a domestic corporation. And a non-resident stockholder of said corporation has the same rights in respect thereto as a resident stockholder.

Grubb, J., dissents.

*(June 15, 1886.)*

ERROR to review a judgment* of the Superior Court of New Castle County in favor of relator, granting a writ of *mandamus*

---

*NOTE—See page 137.

to compel defendant, a corporate officer, to permit relator, a stockholder, to make copies of certain entries in the company's books. *Affirmed.*

This was an application by David M. Richardson, the relator, a resident of Michigan and a stockholder in the Diamond Match Company, a corporation of Connecticut, owning property in this State, for a *mandamus* to compel William H. Swift, a resident of this State, its president, who had possession of certain books and papers belonging to the company, to allow relator to make copies thereof.

These copies were wanted by Richardson for use in certain legal proceedings in the State of Michigan brought by him against Christian H. Buhl and Russell A. Alger of Detroit, to restrain them from selling certain stock of the Diamond Match Company, which he claimed.

This stock had been pledged by Richardson to Buhl and Alger in 1879, and 1880, to secure them against loss by reason of certain indorsements on his notes and as sureties on his bond, under an agreement that Buhl and Alger were to receive a proportion of the net earnings of the stock, and not merely the dividends declared on the same; that on settlement no loss that might be charged on account of the purchase and sale by the company of other match factories should be taken into account; that the earnings were to be estimated from the trial balances of books of the company, and allowance to be made for loss or shrinkage in value of the property of the company, and consideration taken of the improvements made out of the earnings.

Richardson paid his notes and the bond was discharged, but Buhl and Alger refused to deliver the stock to him, claiming that there was still a large balance due them for net earnings of the company during 1881 and 1882. On their proceeding to sell the stock, Richardson brought a suit for an injunction against them, and for use in such suit applied to Swift, as president of the company, for copies of the books in order to show the true net earnings during that time and what deductions from the earnings were proper to be made on account of loss and shrinkage of the property, and what sum should be charged for improvements and ex-

penditures necessary to be made in order to enable the company to make such earnings and profits.

Swift allowed Richardson to inspect the books, but refused permission to make copies; whereupon, Swift applied to the court for a writ of *mandumus* to compel such permission.

At the hearing of the rule in the court below it was stipulated that if the court should be of opinion that the writ should be granted, a peremptory and not an alternative writ should issue. The court granted the writ of *mandamus* and defendant sued out this writ of error.

*George Gray* and *Benj. Nields*, for plaintiff in error.*

*William C. Spruance* and *William M. Lillibridge*, for defendant in error.

*Saulsbury, Chancellor*, delivered the opinion of the court:

The case comes before us upon a writ of error to a judgment of the Superior Court of this State in and for New Castle County, in favor of David M. Richardson against William H. Swift, president of the Diamond Match Company. Richardson was the holder and owner of shares of stock in the Diamond Match Company, a corporation under the laws of Connecticut. Swift was a director and president of said company, and resides in this State.

As a stockholder in said company, Richardson applied to Swift for permission to inspect and take copies of certain papers and documents in his possession, for a purpose which he alleged was necessary and proper, and material to his interest as a stockholder in said company. Inspection was not refused, but permission to make copies or memoranda of said papers and documents was refused. Thereupon Richardson presented his petition to the court below, praying said court to award a writ of *mandamus* against Swift, commanding him to suffer and permit said Richardson to inspect and make copies of the instruments, books, papers, and writings in his custody or control belonging to the said Diamond Match company, to wit:

1. All contracts and agreements for the purchase, by or on

*NOTE. For briefs of counsel, see this case in court below, page 137.

behalf of the said Diamond Match Company, of match factories, and other property relating to the same, prior to January 1, 1881;

2. All instruments in writing conveying or assigning to said company, or other persons in its behalf, property, rights, or fran-chises relating to the manufacture of matches prior to said last mentioned day.

3. All contracts, agreements, or conveyances relating to said purchase of property by or on behalf of said company, other than for materials or supplies in the usual course of its business prior to said last mentioned day.

4. All bonds, contracts and agreements, not to engage in the match business, made to or with said company prior to said last mentioned day.

5. All books, papers and writings of said company, showing the net earnings of the company for and during the years 1881 and 1882.

To Richardson's petition Swift filed an answer, in which he does not deny that the papers and documents mentioned in Rich-ardson's petition, and sworn to be in his possession, were in his possession at the time of the service of the writ or were then in his possession, but states:

"That the law of the said State of Connecticut, under which said corporation was created and exists, provides that 'The state-ments and books of every such corporation shall be kept in the town where it is located, and shall, at all reasonable times be open to the inspection of its stockholders; and as often as once in each year a true statement of the accounts shall be made and exhibited to the stockholders.' And the said law further provides 'That the president and treasurer of every joint stock corporation shall annually, on or before the 15th day of February or August, lodge with the town clerk of the town in which said corporation is located, a certificate, signed and sworn to by him, showing the con-dition of its affairs, as nearly as the same can be ascertained, on the first day of December or January, or on the first day of June or July, next preceding the time of making such certificate, in the following particulars, to wit: 1. The amount of the capital stock actually paid in; 2, the cash value of its real estate; 3, the cash value of its personal estate, exclusive of patents; 4, the amount of

its debts; 5, the amount of its credits; 6, the name, residence and number of shares of each stockholder.' "

The defendant, Swift, also in his answer says:

"That, in conformity to the provisions of the said law, as aforesaid, the statement and books of the said corporation have been and are now kept in the town of New Haven, where it is located as aforesaid, and have been at all times and are now open to the inspection of any of the stockholders; and that, in the month of February in each year since the organization of said corporation, the certificates required by said law, as aforesaid, signed and sworn to by the president and treasurer of said corporation, have been duly lodged with the town clerk of said town of New Haven, and duplicates thereof, made and sworn to as required by said law, have been lodged by them, as aforesaid, with the secretary of the said State of Connecticut; and that in all respects the requirements of the said law, as set forth in the relator's exhibit B, have been fully and faithfully complied with by the said corporation and its officers, and that the said statements and books were not, at the time of the filing of said petition, or at any time since, in the custody or possession of the said William H. Swift."

Now, it will be observed that the relator's exhibit B, in respect to which Swift in his answer says that the requirements of the law have been fully and faithfully complied with by the said corporation and its officers, relates only to: 1, the amount of the capital stock actually paid in; 2, the cash value of its real estate; 3, the cash value of its personal property, exclusive of patents; 4, the amount of its debts; 5, the amount of its credits; 6, the name, residence, and number of shares of such stockholders. And it was in reference to these that Swift says that "The said statements and books were not, at the time of the filing of the said petition, or at any time since, in the custody or possession of the said William H. Swift."

He nowhere makes a similar declaration in respect to the documents and papers, an inspection of which, and the privilege of making copies of which, was demanded of him by the relator, and the privilege of taking copies of which was refused by him. This will appear manifest from the answer of Swift to the petition filed in the court below. He therein says that "This respondent is with-

out authority from said corporation to permit, and is expressly prohibited by said corporation from permitting, the said relator to make copies of its books, papers, or instruments of writing, which may be in his custody or control as president of said corporation, for the purposes mentioned in said petition, unless required so to do by the laws of the State of Connecticut, under which the said corporation exists."

He further says that " To allow copies of all the instruments, bonds, contracts, agreements, books, papers or writings belonging to the said corporation, and mentioned in said relator's petition, to be made by the relator for use and publication in his said suit, would greatly impede, hinder and obstruct the conduct of the business of the said corporation, and injure and greatly damage the interests of the same, and of its other stockholders."

From this, also, it appears that the papers and documents mentioned in the relator's petition as in the possession of the said Swift, and the privilege of taking copies of which was demanded by him, and refused by the said Swift at the City of Wilmington, where they were in said Swift's possession, were not the same as those required to be kept in New Haven by the Act of the State of Connecticut under which the Diamond Match Company was organized, and were not the same statements and books as those mentioned in the relator's exhibit B, which Swift in his answer says were not, at the time of the filing of the said petition, or at any time since, in the custody or possession of the said William H. Swift.

When Swift says that " The said relator has been furnished with statements showing fully and accurately what were the net earnings of the said corporation during the years 1881 and 1882, and has been permitted by the said corporation full and free access to all books, accounts, bonds and papers mentioned in his petition, and to inspect the same personally or by his attorney," he nowhere denies that demand was made upon him by the relator for permission to make copies of the books, accounts, bonds and papers, and that such demand was refused by him.

The right to make copies, and to make abstracts and memoranda, of documents, books and papers, by a stockholder in an incorporated company, is as full and complete as the right of inspec-

tion thereof.    David M. Richardson, the relator, a resident of the State of Michigan, was and is a stockholder of the Diamond Match Company, a corporation created under the laws of the State of Connecticut.    William H. Swift, a resident of the City of Wilmington, in the State of Delaware, was and is a stockholder in the said corporation, and president thereof.

There was and is no law of the State of Connecticut requiring that the president of said corporation should be a resident of the State of Connecticut,    There was and is no law of said State requiring that the papers and documents mentioned in the relator's petition should be kept in New Haven, or in the State of Connecticut.    They were, in fact, kept in the City of Wilmington, in the State of Delaware, and in the possession of William H. Swift, at the time of the demand and refusal of the privilege of copying the same, and are there yet in the same possession, so far as we know from anything in this case.

The grounds upon which the awarding of the *mandamus* was resisted in the court below, and upon which the reversal of the judgment below is asked in this court are sufficiently stated in the answer of Swift, and are as follows :

" And the said William H. Swift further says that the said David M. Richardson and the said Christian H. Buhl and Russell A. Alger are all residents of the State of Michigan, and the controversy and suit pending between them, as appears from the said relator's petition and exhibits filed, arises upon a contract entered into between them in the said State of Michigan, and which was made with respect to the laws of the said State ; and the said controversy and suit do not arise upon any contract or engagement entered into in the State of Delaware, or with respect to the laws thereof; that the said controversy or suit is not with or against the said corporation, or for the purpose of establishing or maintaining any right of the said relator as a member of the said corporation, or compelling the exercise or performance, by any officer thereof, of any corporate function or duty ; and that the suit or controversy does not arise out of or upon any contract or engagement by or on behalf of said corporation, or out of or by reason of any duty imposed by the law upon said corporation, and that the said corporation is not a party to said suit, or interested therein, and can in no-

wise be affected by its determination; that this respondent is without authority from said corporation for permitting said relator to make copies of any of its books, papers or instruments of writing, which may be in his custody or control as president of said corporation, for the purposes mentioned in said petition, unless required so to do by the laws of the State of Connecticut, under which the said corporation exists; that to allow copies of all the instruments, bonds, contracts, agreements, books, papers or writings belonging to the said corporation, and mentioned in said relator's petition, to be made by the relator for use and publication in his said suit, would greatly impede, hinder, and obstruct the conduct of the business of the said corporation, and injure and greatly damage the interests of the same, and of its other stockholders."

A *mandamus* may be defined to be a command issuing from the Superior Court, directed to some person, corporation or inferior court, within the jurisdiction of the superior court, requiring them to do some particular thing therein specified which by law they are bound to do, and which a superior court has previously determined or at least supposes to be consonant to right and justice.

It is unnecessary for the purposes of this case to trace the origin and history of the writ of *mandamus*. While it is true that in England it was originally what is called a "prerogative writ," and is there generally treated as such, in this State, and in this country, it is simply a writ, divested of all its prerogative features, for the enforcement of a remedy by a person having a legal right against another person withholding that right.

Prerogative writs, as such, may be said to have no existence in this State, or in this country. The writ of *mandamus*, and the right to it in all cases to which it is applicable, is as clearly recognized in our jurisprudence as any other writ which may be issued out of the courts of law to which a party may be entitled. A clear recognition of this as settled law will go far to devest the character of the writ of much seeming mystery or obscurity of meaning with which it has been customary to surround it, and will greatly simplify the issue involved in this cause, which is nothing more nor less in its nature or character than a suit at law between one person as plaintiff and another as defendant.

Thus considered, the only questions for us to decide in this

case are: Has David M. Richardson, the plaintiff, shown a clear right against William H. Swift to be permitted by him to inspect and take copies of the papers in the petition mentioned? Has he made demand, and been refused the privilege of so doing by said Swift? Has he any other remedy, or is the writ of *mandamus* his only specific remedy for the enforcement of a clear right which has been denied him? Has he no other adequate or specific legal remedy to compel the inspection, and the right to take copies of the papers and documents mentioned in his petition? Has the relator shown a clear legal right to the particular thing which he has demanded? Has the right been refused by William H. Swift? Did Swift act wrongfully and illegally in refusing the relators's right? And is there no other way in which the relator can legally enforce his right except by the writ of *mandamus*? These are the questions, and the only questions, which are necessary to be decided by us.

The writ of *mandamus* only issues where there is a clear and specific legal right to be enforced, or a duty which ought to be and can be performed, and where there is no other specific and adequate legal remedy. The right which it is sought to protect must, therefore, be clearly established; and the writ is never granted in doubtful cases. The exercise of the jurisdiction to grant it rests, to a considerable extent, in the sound discretion of the court, subject always to the well settled principles which have been established by the courts.

The test to be applied in determining the right to relief by *mandamus* is to inquire whether the party aggrieved has a clear legal right, and whether he has any other adequate remedy, since the writ only belongs to those who have legal rights to enforce, and find themselves without an appropriate legal remedy. " In such case," says High, " the right to the extraordinary aid of a *mandamus* may be regarded, to that extent, as *ex debito justitiæ*." The relator must show, not only that he has a clear legal right to have the particular thing in question done, but also the right to have it done by the person against whom the writ is sought.

A corporator may have a *mandamus* to compel the *custos* of corporate documents to allow him an inspection, and copies of them, at proper times and on proper occasions; he showing clearly

a right on his part to such inspection and copies, and refusal on the part of the *custos* to allow it.   Ang. & A. Corp., 775 and notes of authorities cited ; High, Extr. Rem.

Indeed, upon this point the authorities are uniform, and I shall not burden this opinion with the citation and examination of the numerous authorities which have established it as settled law.

Swift never in his answer objects that the corporation, the Diamond Match Company, is not a party to the proceeding.   He nowhere denies that he is the *custos* of the papers, documents, etc., an inspection and copies of which have been demanded of him and been refused by him.   If he was such *custos*, it was not necessary, in my opinion, that the corporation should have been a party to the proceedings.   Had the corporation been created by the laws of this State, it would not have been a necessary party to these proceedings.   " Indeed," says Angell & Ames on Corporations, 775, " it (*mandamus*) lies to any person who happens to have the books of the corporation in his possession, and refuses to deliver them up.

And High Extr. Rem. (section 31), says, which is more pertinent to the point under consideration :

" As regards the person to whom the writ should be directed, when an inspection of corporate records is sought, the proper practice is to address it to the one actually having the custody of the books and records, even though he is merely a ministerial officer acting under the direction of others, as in the case of a bank cashier acting under a board of directors.   In such case the rule applies that the writ should run to the particular person who is to perform the act required, and the cashier having charge of the books, his refusal to allow their inspection is his individual act, and the writ is therefore properly addressed to him, but there is no impropriety in such case, in directing the writ also to the board of directors."

If the writ should be addressed to the one actually having the books and records, even though he is merely a ministerial officer acting under the direction of others, as a cashier of a bank acting under the board of directors (*People v. Throop*, 12 Wend., 183), it would seem that the corporation was not only not a necessary party, but should not be a party according to such practice, although the

addition of the corporation, or including it in the rule, would not vitiate the proceedings; and the reason is this: that, while the *custos* would be the party to whom the writ should be addressed, he having the books, papers, etc., in his possession, there would be no impropriety in allowing the corporation, whose agent the *custos* was, to answer the rule, and show cause, if it could, why its agent should not be compelled by the writ of *mandamus* to allow the inspection and copies of the same.

Taking this, therefore, to be the proper practice in cases where the *custos* is in possession of the documents and papers, an inspection and copies of which are demanded, and in cases where the corporation is a domestic one, can there be any reason why the rule should be different where the corporation is a foreign one; the *custos* being domiciled in this State, and having possession of the books, papers, and documents by authority of the foreign corporation? I can see none. Swift in his answer says that "The said Diamond Match Company is a corporation created by and existing under the laws of the State of Connecticut, and is not a corporation created by or existing under any law of the State of Delaware; and that the same is located in the town of New Haven, in the State of Connecticut, though it does hold real and personal property in the State of Delaware, and transacts business incidental to its business within the State of Connecticut."

Now, if it holds real and personal property in the State of Delaware, and transacts business incidental to its business within the State of Connecticut, it holds such property and transacts such business by the comity of the State. Its president lives here, and is the *custos* in fact of the documents and papers, an inspection of which, and the privilege of taking copies of which, the relator seeks. The corporation itself does business here, not as a corporation created by the State of Delaware, but as a foreign corporation created by the law of Connecticut.

What results from this? That acting here as a foreign corporation, and holding real and personal property, and doing business as such within this State, it submits or subjects itself to the law of the State, in the same manner and to the same extent, in respect to such property and business, as it would be bound to do were it a corporation created by the State of Delaware; and it owes

obedience and subjection to the mandates of its courts in these respects as fully as if it were a domestic corporation.

Was William H. Swift the legal *custos* as well as the *custos* in fact of the documents and papers, an inspection and copies of which the relator seeks? No Act of the Legislature of Connecticut, and no by-law or rule of the corporation, has been produced showing that provision was therein made for the custody of said books and papers. Nothing has been shown us which requires said documents and papers to be kept within the State of Connecticut. They have not been shown to have been in the possession of any other person than William H. Swift. William H. Swift has for many years resided, and still resides, in the City of Wilmington, in the State of Delaware. He has, and ever has had, the actual possession and control of the same, as far as their history has been made known to us. His possession of them is not to be presumed unlawful, but is, I think, presumed to be lawful. Service of the rule was made upon him, and an answer to it was made by him. He signs himself to said answer as William H. Swift, president of the Diamond Match Company.

Now, suppose Mr. Richardson, the relator, instead of being a citizen and an inhabitant of the State of Michigan, was a citizen and inhabitant of the State of Delaware, and a stockholder in the Diamond Match Company; could anyone reasonably doubt that the courts of Delaware would be competent to afford him the relief he asks by granting him the State's writ of *mandamus?* Does the fact that he is a citizen and inhabitant of the State of Michigan affect his rights in this respect? I think not. Has he not the same rights, as a stockholder in the company to the inspection and copies of the books, papers and documents in the possession of Swift, who must be presumed to be the agent of the directors of the company in respect to such books, papers and documents, and the custody thereof, and who is in fact the president of the company as he would have were he a citizen and an inhabitant of the State of Delaware? Has he not the same rights in respect thereto, in the courts of Delaware, as the citizen and inhabitant of Delaware would have?

Section 2, Art. 4, of the Constitution provides that " The citizens of each State shall be entitled to all privileges and immuni-

ties of citizens in the several States." Among the rights secured is the right to sue in the courts of any State. This is settled by judicial decisions beyond legal controversy.

It does not matter, for the purpose of this case, where the said David M. Richardson and Christian H. Buhl and Russell A. Alger reside, nor how the controversy and suit pending between them arises. The question is: Has the relator shown a clear right to inspect and take copies of the books, papers and documents mentioned in his petition? It is not material who are the parties to the suit in Michigan mentioned in the respondent's answer, nor out of what it arises. The question is: What are the rights of Richardson, the relator, as against Swift, the respondent, in respect to the papers and documents of which Swift is the legal *custos?* It is not in the power of the corporation to prohibit its president and agent from obeying the mandate of the court below. Courts of law are not prohibited from exercising their rightful jurisdiction by such feeble authority, nor will they heed such impotent obstructions. If they have jurisdiction, in all proper cases they will proceed to judgment, and execute their judgments in the manner the law provides.

But the respondent says that "To allow copies of all the instruments, bonds, contracts, agreements, books, papers or writings belonging to said corporation, and mentioned in said relator's petition, to be made by the relator for use and publication in his said suit, would greatly impede, hinder, and obstruct the conduct of the business of the said corporation, and injure and greatly damage the interests of the same, and of its other stockholders."

Why awarding the writ of *mandamus* in this particular case should be attended by such consequences to the corporation is not readily to be perceived. If its transactions have been fair and just in all respects to the members of the corporation and others, it is presumed that such transactions will bear the light of inspection and criticism without impeding, hindering or obstructing the conduct of the business of the corporation, or injuring it in any respect whatever; but the right of Richardson to the relief he seeks depends, not upon the consequences that may result to the corporation, but upon his showing to the satisfaction of the court

that he is entitled to the inspection and copies of the papers mentioned in his petition.

It does not follow that although the court below had the right, and it was its duty, to award the writ of *mandamus* against Swift under the circumstances of this case, the power of the Superior Court in respect to a foreign corporation is unlimited, and may be exercised in respect to all matters in which foreign corporations are concerned. The Superior Court, and even the State of Delaware itself, cannot forfeit the charter of a foreign corporation. It cannot compel the election of a stockholder, nor prevent the removal of one. It cannot, in general, intermeddle with or control the internal concerns of a foreign corporation. Its jurisdiction in respect to such corporations is extremely limited; but it has power to see that the officers, agents, and servants of such corporations, transacting business in this State, by the comity of the State, shall yield obedience to the laws of the State.

I have not made reference to the fact that there is an Act of the Assembly of this State, conferring the right on the Diamond Match Company, a corporation of the State of Connecticut, to hold real and personal property, and to transact its business, within this State; for, although the Act is mentioned in the brief of the respondent's attorneys, and referred to in the argument, it is nowhere stated in the record sent up to us from the court below. The ownership of the property, and the transaction of the business of a foreign corporation, is admitted by the respondent in his answer. The obligations arising from state comity are the same as those that would arise from such an Act of the General Assembly, and would be so regarded by the courts of law.

*For the reasons which I have stated I think that the judgment of the court below should be affirmed, with costs.*

HOUSTON, J., concurred.

GRUBB, J., dissenting:

After mature consideration of this case, and of the principles which in my judgment should control its determination, I feel constrained to dissent from the judgment pronounced by the majority of this court.

As presented by the record now before this Court on error, it is, in its peculiar features, a case of first impression in this State and, apparently, without precedent in the courts of either this country or England.

Its circumstances are most novel: The relator below is a citizen of Michigan and a stockholder in the Diamond Match Company, which has been incorporated exclusively under the laws of Connecticut, and holds property and transacts a part of its business in Delaware.

Being involved in a suit in Michigan, solely against citizens of Michigan, relating wholly to his stock and the net earnings thereof in said corporation, pledged by him to the defendants in said suit as security for a loan by them to him, the said relator has applied to the Superior Court in Delaware, as such stockholder, for a mandamus against the respondent Wm. H. Swift, as president of said corporation, who resides in this State and has in his custody here certain books, agreements and other instruments belonging to said corporation, to compel said Swift, as such president, to allow the relator to make inspection and copies in Delaware of said books, etc., for purposes of evidence in his said suit, and which he alleges are necessary to enable him to maintain it.

The adjudification of this case does not require either the consideration or decision, of all the various and interesting questions raised at the argument. I shall, accordingly, confine myself to the principal inquiry upon which its decision depends, and refrain from determining whether or not a stockholder in a private corporation is entitled to have copies of its corporate books, contracts, etc., for use in a suit to which the corporation is not a party and in the result of which it is not interested; or whether or not, in case such right exists, the corporation should be made a party to mandamus proceedings for its enforcement; or whether or not, in the present instance, the said respondent Swift was authorized under any law of Connecticut to have the custody and control, in Delaware, for any purpose, of the books, agreements, etc., specified in the petition of the relator below, and particularly for the purpose of allowing the relator to make inspection and copies thereof in this State for the object mentioned in his said petition.

It may be well to observe, however, that it is a well settled

principle of law that a corporation can do no acts, either within or without the State which creates it, except such as are expressly authorized by the law creating and empowering it, or derived from a true construction thereof; and the acts must be done in the manner and by the officers or agents indicated in such law.

*Bank of Augusta v. Earle,* 13 Peters, 587; *Railroad v. Koontz,* 104 U. S., 11, 12; *Field on Private Corp.,* Sec. 243, 261.

In this connection the serious question arises: "Has the relator shown affirmatively and beyond doubt (as the law governing the allowance of mandamus requires him to do) that any law of Connecticut either expressly or impliedly authorizes Swift, even to have in Delaware, except possibly for his own convenience as president, the said books, etc., specified by the relator, much less to allow a stockholder to make inspection and copies of them there?" And if not affirmatively shown, can this be presumed in view of the settled principle regarding acts done outside of the State of domicile, and in view of the refusal of the board of directors to permit Swift to allow such copies to be made by the relator in Delaware?

The relator, as the record discloses, nowhere avers or shows that Swift was expressly so authorized; not does it appear expressly in any way.

Is there anything, then, in any law of Connecticut which implies any authority or imports any design to have the said books, agreements, etc., of the said corporation taken or used outside of Connecticut for the purpose of allowing a stockholder inspection or copies of them in Delaware or elsewhere? Do not the express provisions and the general purport and policy of the Connecticut incorporation law more reasonably imply the contrary? Especially those provisions which require that the corporation shall be located in a particular town in Connecticut, where its books and annual statements shall be kept, and shall at all reasonable times be open for the inspection of any of its stockholders; that an assistant treasurer shall be appointed when the treasurer shall reside out of Connecticut, who shall reside within the State, and upon whom notices in all legal proceedings may be served, and who, instead of the treasurer, may sign the annual statements showing the condition of the corporate affairs?

Do not these, in connection with the provisions of said law requiring the attorney for the State, whenever he shall be of the opinion that the public good requires it, to institute proceedings for a dissolution of the corporation, strongly imply that the books and other papers and instruments necessary to ascertain the exact condition of the corporation, shall be kept in Connecticut for the convenience of that State, in case dissolution proceedings should be required at any time, and, therefore, that the stockholders' right to inspection, and copies, if it exist at all, is subordinate to this paramount claim of the State, and that the exercise of such right without the limits of Connecticut is inconsistent with both the law and the rights of said State?

And is Swift's mere possession of the said books, agreements, etc., in Delaware alone sufficient, in view of the foregoing, to raise the legal presumption that he was lawfully authorized to have them here for such inspection and copies? Is it not more reasonable to infer that he had them here exclusively for his own convenient examination and use as president of said corporation?

And is it not to be presumed, since the record shows nothing to the contrary, that, being a corporate officer, he would do his duty as such in all respects, and would, therefore, return them to Connecticut whenever required by said corporation, or by the courts of that State, to do so for any lawful purpose; and that, consequently, the relator might have had the inspection and copies sought by him if he had made application therefor to the said corporation or the proper court, in Connecticut, instead of applying therefor in Delaware?

In the light of the foregoing considerations, are not the probabilities against, rather than in favor of the relator's alleged right to have inspection and copies outside of that State? At the best, is not this right doubtful? If so, the relator is not entitled to relief by mandamus, for the writ is never granted in doubtful cases and the onus is upon him clearly to establish his right. High Ex. Rem., Sec. 9.

But I pass to the graver question—to that which is the paramount inquiry in this case, and the proper determination of which will be sufficient decisively to dispose of it. Has the Superior Court in this State, under existing constitutional and legislative

provisions, jurisdiction by mandamus over a foreign corporation, its officers or agents, to enforce the performance of a corporate duty not imposed by any law of this State?

A careful investigation of the theory upon which corporations both public and private are created, and also of the theory upon which mandamus has hitherto been awarded and employed, especially in this State, must, as I conceive, furnish a negative answer to this inquiry.

The power to confer corporate franchises and privileges always has been considered as vested in the sovereign authority of the State.

The creation of a corporation, whether public or private, is an act of sovereignty whereby a portion of the sovereign powers is conferred upon the corporators. In this country corporate rights and franchises can only be conferred by legislative enactment. Field on Private Corp., Secs. 11, 15; *Bank of Augusta v. Earle*, 13 Peters 595, 587.

Corporations are created, and their rights, powers and privileges are granted for the public good. *Dartmouth College v. Woodward*, 4 Wheaton, 637.

In the case of private incorporations, which are grants of exclusive franchises and special privileges to particular individuals, the theory that such corporations are created for some supposed public good has furnished the legitimate ground in this country, for such an exercise of legislative power. Cooley Const. Lim. p., 394. In Field on Private Corp., Sec. 17, it is said: "The legislatures of the several states have, by their respective constitutions, the power to make laws and legislate upon all subjects pertaining to the public benefit, and this, in the absence of express provisions on the subject, carries with it by implication, the right to use all the means requisite to the accomplishment of the objects of legislation consistent with the purposes for which the government is instituted and with the state and national constitutions. The public benefit to be derived is the consideration on the part of the State for the creation of private corporations. The motive of the sovereign creating it is supposed to be some good the public will derive from it. This advantage has been considered sufficient to bring their creation by the legislatures within the scope of the general powers

to legislate for the public benefit, and it seems now to be universally recognized."

In consideration, therefore, of the grant of special privileges and franchises the corporation accepting it enters into an implied obligation to the sovereign grantor to exercise all the functions and perform all the duties necessary to fulfill the ends of its creation and promote the supposed public good; and this implied contract made with the sovereign power enures to the benefit of every individual interested in its performance. *Dartmouth College v. Woodward*, 4 Wheat., 637, 658. Cooley Const. Lim., p. 248.

From this obligation to the state creating the corporation, results the duty to that sovereignty (among other corporate duties) to allow a stockholder the right, when such right clearly exists, to make an inspection of corporate books, papers, etc.

For a failure of the corporation duly to exercise its franchises and functions, and fulfill its obligations to the state creating it, the law has provided two extraordinary remedies, viz : Mandamus to enforce specific performance, and quo warranto to compel a forfeiture of the franchises and a dissolution of the corporation for non-performance of corporate duty.

Mandamus is the proceeding employed in the exercise of the sovereign supervisory power over the agencies created and empowered by sovereignty for the promotion of the public welfare, to compel these to fulfill the ends of their creation.

The people of the sovereignty creating and empowering these agencies, are necessarily interested in seeing that they fulfill the ends of their creation, and do not abuse the powers and franchises with which they have been entrusted, and hence this proceeding should be always in the name of that particular people or State. In England this supervisory power resides in the Court of King's Bench, and in this State in the Superior Court exclusively.

"In England," says Chief Justice Taney, in 1838, speaking prior to the common law procedure act of 1854, in *Kendall v. United States*, 12 Peters, 629, " the writ of mandamus can be issued by the Court of King's Bench only. It can not be issued by the Court of Common Pleas, or any court known to the English law, except the Court of King's Bench. Its peculiar powers are clearly stated in 3 Black. Com. 42, in the following words: " The juris-

diction of this court is very high and transcendent. It keeps all inferior jurisdictions within the bounds of their authority, and may either remove their proceedings to be determined here, or prohibit their progress below. It superintends all civil corporations in the Kingdom. It commands Magistrates and others to do what their duty requires in every case where there is no other specific remedy,' " etc. " It is from this high and transcendent jurisdiction that the Court of King's Bench derives the power to issue the writ of mandamus, as appears from the same volume of Blackstone's Commentaries, p. 110. These peculiar powers were possessed by the Court of King's Bench, because the King originally sat there in person, and aided in the administration of justice. According to the theory of the English Constitution, the King is the fountain of justice, and where the laws did not afford a remedy, and enable the individual to obtain his right by the regular forms of judicial proceedings, the prerogative powers of the sovereign were brought in aid of the ordinary judicial powers of the Court, and the mandamus was issued in his name to enforce the execution of the law. And although the King has long since ceased to sit there in person, yet the sovereign is still there in construction of law, so far as to enable the Court to exercise its prerogative powers in his name; and hence its powers to issue the writ of mandamus, the nature of which Justice Doddridge, in *Awdley v. Joy*, Popham 176, so forcibly describes by calling it extra judicial, and one of the flowers of the King's Bench. It is, therefore, evident that, by the principles of the common law, this power would not be incident to any court which did not possess the general superintending power of the Court of King's Bench, in which the sovereignty might, by construction of law, be supposed to sit, and to exert there its prerogative powers in aid of the Court, in order that a right might not be without a remedy." " The English common law was adopted in the Colony of Maryland and the courts of the province formed on the same principles.   *   *   *   *   *   *
In other words, the general court was in the State of Maryland, after the Revolution, precisely what the Court of King's Bench was in England. *Runkel v. Winemiller*, 4 Harris and McHenry, 449. This case was decided in 1799, in the General Court, and it shows, most evidently that the power of issuing the writ of mandamus

was confined to that Court, and was derived from its King's Bench powers of superintending inferior courts and jurisdictions in the execution of the law, and that this power was not possessed by any other court known to the laws of Maryland."

And again in this same case of *Kendall v. United States*, 12 Peters, 621, Mr. Justice Thompson, in delivering the opinion of the Court, said : " The theory of the British Government and of the Common Law is, that the writ of mandamus is a prerogative writ, and is sometimes called one of the flowers of the Crown, and is therefore confided only to the King's Bench, where the King at one period of the judicial history of that country, is said to have sat in person, and is still presumed to sit. And the power to issue this writ is given to the King's Bench only, as having the general supervisory power over all inferior jurisdictions and officers, and is co-extensive with judicial sovereignty. And the same theory prevails in our State governments, where the Common Law is adopted, and governs in the administration of justice ; and the power of issuing the writ is generally confided to the highest Court of original jurisdiction."

It is true that Judge Taney subsequently in 1860, in *Kentucky v. Dennison*, 24 How., 97, said : " The right to the writ of mandamus, and the power to issue it, has ceased to depend upon any prerogative power, and it is now regarded as an ordinary process in cases to which it is applicable." This expression was used in a case before the United States Supreme Court and was correct so far as respects the use of the writ in the Federal Courts. In *Commissioners of Knox Co. v. Aspinwall et al.*, 24 How., 384, decided subsequently to *Kentucky v. Dennison*, the Court say : " By the common law, the writ of mandamus is granted by the King's Bench, in virtue of its prerogative and supervisory power. The courts of the United States cannot issue this writ by virtue of any supervisory power at common law," &c. And in *Kendall v. United States*, 12 Peters, 621, the Court say : " To consider the writ of mandamus in use here, as it is in England, the issuing of it should be confined to this Court as it is there to the King's Bench. But this power is not exercised here as in England by the King's Bench, as having a general supervisory power over inferior courts," &c. The said language of Judge Taney, moreover, was

used after the English common law procedure act of 1854 had conferred mandamus jurisdiction upon all the Superior Courts in that Kingdom, and had entirely revolutionized the practice and procedure in its exercise. " The effect," says High, " of this sweeping enactment has been to place mandamus proceedings upon much the same footing as ordinary personal actions, and although the statute expressly preserves the jurisdiction of the King's Bench as formerly exercised, its necessary result would seem to be the almost total annihilation of the prerogative features of the remedy, reducing it to a personal action for the protection of individual rights." High Ex. Rem., Sec. 28. While Judge Taney's expression, consequently, may be applicable to the use of mandamus in the Courts of the United States and in the Courts of England since the recent changes there, yet it can not properly apply to its use in this, or other States where the common law theory of its employment (as formerly in the King's Bench) has always prevailed and not yet been altered, or modified by statute, and adjudications to the contrary in any such States, are a virtual assumption of legislative power.

It follows, therefore, that, in some of the earlier settled States of the Union, where the common law is adopted, and where the power to issue the writ is given to one Court only, as having the general supervisory power over all inferior jurisdictions and officers, there mandamus has been used as a prerogative writ, in the supervisory sense, as fully and amply as in the King's Bench in England prior to the modern legislation modifying its use there. That it was so in Maryland has already appeared from Judge Taney's opinion in 12 Peters, 631. It has also been so used in New York and Illinois. High Ex. Rem., Sec. 4, note 1. The same view has prevailed in this State from our earliest colonial period. The writ of mandamus never has been expressly mentioned in any of the constitutions or statutes of this State. Jurisdiction by mandamus has been derived from and as incident to the general supervisory powers originally conferred by statute upon the Supreme Court of this State, and afterwards upon its successor, the present Superior Court, pursuant to the provisions of our existing constitution. These supervisory powers have always been confined exclusively to one Court in this State. They appear to have been

conferred as early as 1726–'36, by the provisions of chapter 54, of volume 1, Delaware Laws, p. 124, which, as modified by the subsequent act of 1760, vol. 1, page 376, and continued under our constitutions of 1776 and 1792 (Hall's Digest, 104), and of 1831, are now in force and contained in Sec. 2, Chap. 92, Amended Code, 564.

That the jurisdiction of our Superior Court by mandamus is the same precisely as that formerly exercised by the Court of King's Bench in England; that it is an exercise of its prerogative and supervisory power, and that this power is derived from the aforesaid provision of section 2, chapter 92, is shown by the uniform current of authoritative adjudication in this State. It has the direct support of Chief Justice Bayard, delivering the opinion of the court in 1840, in *State v. Wilmington City Council*, 3 Harr., 299, and also of Judge Harrington in the same case, 307. Also of Chief Justice Gilpin in 1864, in *Cannon et al. v. Janvier et al.*, 3 Houst., 31. Also of Chief Justice Comegys in 1880, in *State ex rel. Ferris v. Knight et al.* (not yet reported.) These were cases adjudicated in the Superiour Court. But this view has also the sanction of this Court of last resort in this State. For, in *Knight et al. v. State ex rel. Ferris*, before this Court on error in 1882, Chancellor Saulsbury, delivering the opinion of the Court (not yet reported) said : " The office of the writ of mandamus is to compel a corporation, an inferior court, or a public officer to perform some particular duty incumbent upon them which is imperative in its nature, and to the performance of which the relator has a clear legal right." " The remedy is extraordinary, and if the right is doubtful, or the duty discretionory, or if there be any ordinary and adequate specific legal remedy, this writ will not in general be allowed." " In England it is considered to be a prerogative writ, and was so called because the power to issue it was vested in the judges of the King's Bench, the Court in which the sovereign is supposed to be personally present. It is a remedial writ, the appropriate functions of which are the enforcement of duties by officers and others, who either neglect or refuse to perform their duty, and for the enforcement of which duties there is no other specific legal remedy." * * * " The Superior Court exercises jurisdiction in respect to all matters purely legal, whether of

Common or Statute law, the exercise of which is not vested in tribunals, and being the highest Common Law Court in the State, it has the only authority in this State to award the Common Law writ of mandamus, an authority designed to be supervisory over all inferior legal tribunals, corporations and persons bound to the proper discharge of authority with which they have been clothed by law for the public benefit." Pamphlet opinion, 4, 6.

The effect of this uniform current of adjudication, by our most eminent judges in our highest Courts here, is conclusively to establish that, in this State, until it shall be modified, as in England, by legislative authority, mandamus is a prerogative writ in the supervisory, though not the regal sense—a writ of sovereignty, not a royalty; that it is issued by our Superior Court, not of course, but only in the exercise of a sound judicial discretion, and employed precisely as in the Court of King's Bench in England prior to the statutory modifications there, and in the exercise of an "authority designed to be supervisory;" and that it properly can be employed only against inferior legal tribunals, corporations and "persons bound to the proper discharge of authority with which they have been clothed by law for the public benefit"—that is, persons standing not in a private relation, but in some relation to the public, having a public trust and duty to fulfil and therefore having, in that sense, the status of a public officer. This being so, mandamus can not, appropriately, or lawfully be granted by our Superior Court against any such tribunal, corporation or person, whose powers and duties have not been conferred and imposed by some exercise of the sovereign power of this State.

With respect to its employment against private corporations, in particular, this doctrine is peculiarly applicable. As heretofore stated, a private corporation in this country is created exclusively by statute. Its creation is an act of sovereignty conferring upon specified individuals a portion of the sovereign power for some supposed public good, and which powers they enter into an implied obligation to the sovereign grantor to exercise preliminary in the interest of the people of that particular sovereignty or State, in consideration of its corporate grant. In this and other States, this supposed promotion of the public welfare, in theory at least, is the only legitimate ground for this exercise of legislative authority and

grant of sovereign power to the corporators for the purposes of private incorporation. It is therefore manifest, since such corporation and the State creating it are the only parties to this obligation, that the duty to fulfil it is due solely to that State, and that the right to superintend and enforce its fulfillment belongs to that particular sovereignty alone. Mandamus, then, being the appropriate writ of sovereignty for this supervisory purpose, and the ground and object of its use being to remedy the abuse of franchises conferred by sovereignty, it can only be issued, when invoked against a private corporation, in the name and by the authority of the State which created the corporation, and to which State is exclusively due its obligation to duly exercise its powers and functions so as to promote primarily the public good of the people of that State in fulfillment of the design which that particular sovereignty had in creating such corporation; and this is true whether the writ be invoked by the legal officer of the State, to enforce the obligation in behalf of the public generally, or sought by a stockholder of the corporation, to compel the performance of a corporate duty which may result from this obligation to the State, and so enure to his private benefit. And this principal is equally applicable whether the stockholder is a resident or non-resident of the State of the domicile of the corporation. In either case the stockholder voluntarily and, in legal presumption, knowingly submits himself to the operation of this legal principle when he becomes a member of the corporation.

The approved definitions of the nature and use of mandamus, as formulated by Courts and text writers of high authority, must be understood as applicable only when the writ may be invoked against a private corporation or its officers within the State alone whose legislature has incorporated it, or imposed the duty sought to be enforced. For these definitions do not properly apply when the writ is sought elsewhere, and the assumption that they do must necessarily lead to erroneous conclusions.

The precise question now under consideration does not seem ever to have been adjudicated in the Courts of England. Certainly no decisions relating to it were present at the argument, and it was said that none could be found in the English reports. Considering how numerous are the corporations transacting business in England

of foreign creation and domicile, the absence of any application to an English Court for a mandamus against any such corporation is certainly significant, if not conclusive of its inapplicability thereto.

In this country there is almost as significant an absence of such applications, excepting where such use of the writ has been authorized by statute. In but two of the thirty-eight States of the Union, has the question been the subject of judicial consideration, and, in both, the right to the writ at common law and in the absence of a statute authorizing such use, against a foreign corporation, was denied. The first instance was in the case of *People ex rel. Jenkins v. The Parker Vein Coal Co.*, 10 Howard, N. Y., Practice Rep., 543, where the relator asked for a mandamus to compel the defendants to open the transfer books of the corporation to the relator and to all such stockholders as may desire to transfer stock. In his opinion in that case Mitchell, J., remarked : " The mandamus partakes of the character of a public writ, one in which the people are in some way interested ; and it has never been allowed except for the purpose of controlling those owe a public duty to the State in which it issues. This company is incorporated in Maryland, and although it has an office here and may be used here on its contracts and obligations to individuals or others, yet it does not owe allegiance or public duties to this State, or according to the laws of this State, but to the State of Maryland and according to the laws of that State. If it violates its character the remedy should be in Maryland and not here." This New York case is entitled to the greater consideration here because mandamus is regarded in that State, as has been shown, as a prerogative writ in the supervisory sense ; which view is in harmony with the King's Bench theory and practice respecting the writ that has also prevailed in this State.

But the case of *Curtis v. McCullough*, 3 Nevada, 202, is a case of especial importance to this inquiry, because in it the question of the common law power of the Courts of Nevada to grant mandamus against the ex-superintendent of a California Mining Corporation, resident in Nevada, to compel him to deliver, to his successor, the mine, books, &c., of the corporation, in his possession in Nevada, came directly before the court for its adjudication. The court held that, as the corporation was created, and its duties im-

posed solely by California, neither it, nor its officers as such had any existence in Nevada; that its superintendent was merely its agent in Nevada enforcing his individual right to be such agent against the ex-superintendent, who was also merely an unofficial person withholding the right; and that therefore mandamus was not allowable, in such a case, at common law, but only by virtue of the express terms of a Nevada statute. In their opinion the Court say: " No judgment can be rendered here which will bind the corporation; this proceeding is simply between individuals over whom the Courts of this State have jurisdiction, but who claim their rights from a corporation; " and the mandamus was accordingly awarded against the respondent as an unofficial person merely, and not under authority of any common law power, but exclusively under a statutory authority which the Court expressly to be " broader than any common law power." And yet this case was cited and much relied on, in behalf of the relator, at the argument.

Again, if private corporations can only be created by the legislative power in a State, for a public purpose in theory, are they not therefore, in a legal sense, the agents or instrumentalities of that sovereignty, exercising a portion of the sovereign powers for the benefit of the people of that State, and therefore a part of its internal administration and domestic concerns? If so, then the right asserted by the relator in this case, to have a mandamus here to procure the books, contracts, etc., of a foreign corporation for the purpose of making inspection and copies thereof, if allowed, might greatly hinder and obstruct the conduct of the business of the said corporation and damage its interests, as the respondent in his answer alleges, and without denial by the relator, that it would. In that case the allowance of the mandamus here would be an interference by this State with the internal administration and domestic institutions and concerns of another State; for if it be conceded that, by such a proceeding, the books, contracts, etc., of a foreign corporation can be held for an instant, then they can be held indefinitely and so prevent the due performance of its functions and duties and the fulfilment of the public objects for which it was created. In the absence of a statute of Delaware authorizing such a use of mandamus by our Court, as a condition of the

enjoyment by such foreign corporation of the comity of our State, this would surely be an unlawful use of our writ and an unwarranted exercise of judicial power! In this county, under our American system of government, it is a fundamental doctrine that the Federal Courts cannot interfere by mandamus with the administration of the internal concerns of a State; 24 How., 107; nor can one Sovereign State of the Union with those of another State : I Kent Com., 462; nor can a State with the administration of the Federal government; 6 Wheaton, 599. It is a presumption of law, therefore, that the Courts of one State will not assume jurisdiction by mandamus, in the absence of clear statutory authority conferring it, to enforce the corporate duties of a foreign corporation and thereby interfere with its due fulfilment of the primary object of its creation, viz., the promotion of the public good of the State of its domicile.

And here the pertinent inquiry arises : Does not the true construction of said Section 2 of Chapter 92 of our Code, from which the supervisory jurisdiction of our Superior Court by mandamus is derived, negative any claim of power to exercise it against a corporation, or its officers or agents, unless such corporation has been incorporated, or the duty sought to be enforced has been imposed by some statute of this State? So far as this supervisory jurisdiction relates to magistrates and other officers it is limited and confined by our statute to such as are " within this State," to quote the precise words of said Section 2, that is, to such officers only as are created, or whose duties are imposed by this State alone. And so far as such jurisdiction over corporations is derived from said Section 2, it must likewise, in principle, and, presumably, in the intent and meaning of those who enacted it, be confined to such corporations as are created, or whose duties are imposed by this State exclusively. For the law is definitely settled that a corporation can have no legal existence outside the territorial limits of the sovereignty which created it. Nor can its officers be recognized in their official character out of the jurisdiction of the State which created the corporation, but only as are the agents of a natural person residing in another State. *Custis v. McCullough*, 3 Nevada, 202; *Bank of Augusta v. Earle*, 13 Peters, 519, 588; *Paul v.*

*Virginia,* 8 Wallace, 181; *Railroad v. Koontz,* 104 United States, 11; *Field on Private Corporations,* sections 25, 243, 244.

It is equally well settled that a foreign corporation does not become a corporation of another State than that of its creation and domicile, by holding real or personal property or transacting a portion of its business therein. *Railroad v. Koontz,* 104 United States, 10, 13; *B. & O. R. R. Co. v. Carey,* 28 Ohio State, 208: *Blackstone Manufacturing Company v. Inhabitants of Blackstone,* 13 Gray, 488.

It is not sufficient for the purposes of his case, for the relator to urge that because a foreign corporation, by the comity of this State, holds property and transacts business by its agent here, therefore it is subject to our writ of mandamus. It may be true that such a corporation may thereby be served with our process, or attached, and its property real and personal within our State, made liable to execution in actions upon its contracts made in or out of Delaware. But to contend that, therefore, it, or its agents, or its property are subject to our writ of mandamus for non-performance of a corporate duty not imposed by our laws, is to lose sight of the distinction between an action on contract and a mandamus proceeding. The former is employed to recover satisfaction for the non-performance of an obligation touching a private interest, and due primarily to the person interested, while mandamus is a writ of sovereignty to compel the specific performance of an obligation touching a supposed public interest and due primarily to the State, and therefore employed exclusively by that sovereignty to which alone the obligation is due, whether invoked by the proper law officer of the State in the public behalf, or by some person having a private interest in its performance. When it is employed to enforce a corporate duty arising out of such an obligation to sovereignty, (and the duty to allow inspection and copies of corporate books, papers, etc., when it exists, is such a corporate duty), it must, therefore, be issued exclusively by the State creating the corporation or imposing the corporate duty. Without a corporation there can be no corporate duty. In Delaware a corporation can be created only by authority of a statute enacted in the prescribed constitutional manner. Here, it cannot be created by comity. Otherwise a foreign corporation, holding property, and

transacting business by its agents in our State, by our comity, (which is merely the voluntary permission of the State to do so subject to its views of sound public policy), could not be excluded and denied that privilege whenever our State policy might require this, notwithstanding that the right of the State to do this is established by undoubted authority. *Paul v. Virginia*, 8 Wallace, 181. For, if by mere comity it could become a corporation of our State, and, like other domestic private corporations here, under obligation to the State as such, to perform its corporate functions and duties, then under the "contract" doctrine of the Dartmouth College case, 4 Wheat., 518, it could not be so subjected to such exclusion and denial. Accordingly, it is manifest that a foreign private corporation by holding real and personal property and transacting business as such within this State, by the comity of Delaware, does not "submit or subject itself" to the law of the State in the same manand to the same extent, in respect to such property and business, as it would be bound to do were it a corporation created by the State of Delaware, or owe obedience and subjection to the mandates of its Courts in these respects as fully as if it were a domestic corporation," (as the majority opinion of this Court asserts) so far, at least, as respects the use of our writ of mandamus against such foreign corporation. Therefore, where a duty is sought to be enforced against a foreign corporation or its agents by mandamus in this State as a corporate duty (and it is sought as such in the pending case) it must appear to have been imposed by a Delaware legislative enactment incorporating such foreign corporation or imposing the duty as a condition of its enjoying the comity of our State.

A corporate duty, as such, does not exist, or arise " by common law " in this State, or elsewhere in this county, but only by statute, nor does the right to inspect, or have copies of corporate books, papers, &c., or any other rights springing from corporate duty. Since all the powers and duties of a private corporation created under and by virtue of a legislative enactment, (as the said Diamond Match Company has been, in Connecticut exclusively,) are derived from the statutory grant of such powers, the duty to allow such inspection and copies, and the corresponding right to have it performed, when these exist and are not expressly mentioned in the statutory grant, are, according to common law rules of inter-

pretation, impliedly contained in such grants as necessary incidents to the due and proper fulfillment of the ends for which the corporation was created. Such right of inspection, etc., is, therefore, not a common law right, found outside of the statutory enactment conferring the corporate powers, etc., but within its terms and their true meaning and import as legally ascertained by means of common law rules of construction. *Bank of Augusta v. Earle,* 13 Peters, 587.

Accordingly it is evident that neither a foreign corporation, as a corporation, nor its officers, as corporate officers, can have existence in Delaware by comity, or otherwise than by appropriate legislative enactment here; and further that no corporate duty, whether to allow a right of inspection, etc., to a stockholder, or other right, can be due from a foreign private corporation, or its officers or agents, as a corporate duty by the common law of Delaware. The present proceeding, as the record shows, is to enforce a corporate duty, as such, against a corporate officer, as such, and when the officer and the duty (if it exists) have existence solely by force of a Connecticut statute. It is not a proceeding on the part of the relator to require the respondent to perform a duty due by him as a person, in his individual capacity merely, but as the president of a foreign corporation and in his official capacity entirely.

But it has been insisted that, since the said respondent resided in Delaware, and had the needed books, etc., in his possession here, the Court below had jurisdiction of the *custos* and the *res,* and, therefore, it might lawfully award the mandamus to compel the respondent to allow the required inspection and copies thereof. But since it has been shown that neither the said corporation is a corporation, nor the respondent a corporate officer thereof, in Delaware, and that the said duty sought to be enforced is not a corporate duty arising either at common law, or under any statute of this State, it follows that it must be a duty due from the respondent as a person, and · in his individual capacity, and not as an officer of said corporation. But the present proceeding is against him as president and officer, and not as an individual merely, and to perform a corporate duty and not an individual duty, and hence the claim on this ground is at variance with the alleged right as claimed of record.

But even if it might properly be claimed, in the pending proceeding, under the present state of the record, as a mere individual duty, because the respondent resides here and has the needed books, etc., within the jurisdiction, yet, in the absence of a statute authorizing its use for this purpose, the writ would not be allowable in view of the theory and principles heretofore stated. *Custis v. McCullough*, 3 Nevada, 202. It might as well be contended that the writ could lawfully be awarded to compel the agent of a non-resident individual or partnership manufacturer to allow inspection and copies of such manufacturerer's books, etc., in his charge, when required for purposes of evidence in a suit.

A foreign corporation, having no existence without the limits of the State of its creation, neither it, nor its officers, qua officers, can be present in Delaware. Its agents are here as individuals merely, and while its property here may be subject to execution in satisfaction of contracts made, or torts done here by its agents, neither the corporation nor its agents are liable to our mandamus to enforce for the benefit of either a resident or non-resident of Delaware, any right arising from any of its corporate duties; for these are obligations due only to the foreign State which created it, and, therefore, although there may be jurisdiction over the *custos* and the *res*, for the purposes of actions *ex-contractu* and *ex-delicto*, there is none over the corporate duty, as there must be to warrant mandamus in this State, either at common law or under our existing constitution and legislation.

This conclusion rests upon legal theories and principles which are so familiar as to seem fundamental. To these both private corporations and the writ of mandamus owe their origin, and by these they must be recognized and governed in dealing with them. These furnish the reason for the existence of the former, and the ground for the application of the latter as the appropriate remedy for enforcing the obligations of such corporations to the State of their creation. And these, too, furnish the ancient lines of demarcation which separate and distinguish this form of remedy from all others. Disregard or destroy the distinguishing marks which indicate the established and familiar boundaries of this, or other forms of remedy, and hopeless confusion must prevail, and both lawyers and Courts become embarrassed by perplexing uncertainties.

24

Desirable as it may be liberally to extend and adapt the ancient rules and remedies of the law to the needs of modern change and progress, yet to attempt this when it inevitably leads to their transformation, or disfigurement beyond practical recognition or identification is unwarranted as it is illogical.

Apply our writ of mandamus to a case like the pending one, and its distinctive character and limitations will be discarded, and it may then issue as well against a private person or partnership as against a public officer or a corporation; and as well to meddle with private affairs as to superintend the public interests. The plea of supposed hardship or inconvenience may possibly induce legislative, but it should not judicial enactment in this behalf. In its use of mandamus the Court of King's Bench in England, notwithstanding its " high and transcendent" supervisory jurisdiction, kept strictly and faithfully *super adequas vias* of the Common Law until a departure therefrom was authorized by legislative enactment, and the Superior Court in this State should do likewise.

To extend this investigation further is needless. In my judgment, it has conclusively demonstrated that the Superior Court, in Delaware, has not jurisdiction by mandamus over a private incorporation of exclusively foreign creation, its officers or agents, to enforce the performance of a corporate duty not imposed by any statute of this State, until our Legislature has, by further enactment, conferred such jurisdiction. In the absence of such legislation, therefore, the judgment of the court below awarding the peremptory writ was erroneous and unauthorized.